**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-23462-CIV-MOORE/BECERRA**

VIRGINIA VALLEJO,
an Individual,

       Plaintiff,                              **Jury Trial Requested**

v.

NARCOS PRODUCTIONS LLC,
a Delaware limited liability company;
NETFLIX, INC., a Delaware corporation;
GAUMONT TELEVISION USA LLC f/k/a
GAUMONT INTERNATIONAL TELEVISION LLC,
a Delaware limited liability company; and DYNAMO
PRODUCCIONES S.A., a foreign business entity;

       Defendants.

_____/

**FIRST AMENDED COMPLAINT FOR WILLFUL COPYRIGHT INFRINGEMENT**

Plaintiff VIRGINIA VALLEJO ("Plaintiff" or "Vallejo") hereby files her Complaint

sounding in willful copyright infringement and in support provides the following:

**THE PARTIES & THE NATURE OF THE ACTION**

1.     Vallejo is a renowned and internationally recognized television and radio journalist,

and the author of the acclaimed best-selling, "Amando a Pablo, Odiando a Escobar" in English:

"Loving Pablo, Hating Escobar" (Vallejo's "Memoir").[1]  As noted therein, "[t]he [M]emoir details

her relationship with Pablo Escobar ("Escobar"), and her cooperation with Colombian and United

States authorities in prosecuting Alberto Santofimio Botero, ex-Senator and ex-Minister of Justice,

drug cartel bosses, and others."  These incredible events that are the subject of the Memoir placed

_____

[1] This pleading contains several instances referring to passages from the Memoir or other
writings and including translation of Spanish to English.  These translations are not certified, but
certified translations will be prepared in the course of proceedings as required.

Vallejo's life in jeopardy.  The United States government granted Vallejo political asylum, and she is a resident of the State of Florida, residing in this judicial district.

2.     Narcos Productions LLC is a limited liability company organized under the laws of the State of Delaware and having its principal place of business at 750 N. San Vicente Boulevard, #1150 East Tower, West Hollywood, California 90069, and holds itself out as "the entity responsible for producing the highly successful, critically acclaimed, and award-winning television series *Narcos*" (hereinafter "Narcos Productions").

3.     Netflix, Inc. is a corporation organized under the laws of the State of Delaware with its principal executive offices at 100 Winchester Circle, Los Gatos, California 95032.  Netflix produced and distributes the television program, *Narcos*, first released on or after August 28, 2015 (hereinafter, "Narcos" or the "Show").

4.     Gaumont Television USA LLC f/k/a Gaumont International Television LLC is a limited liability company organized under the laws of the State of Delaware, with its principal executive offices at 750 North San Vicente Boulevard, Suite 1550 East Tower, West Hollywood, California 90069 ("Gaumont").  Gaumont produces and distributes television programming including Narcos.

5.     Dynamo Producciones S.A. is, upon information and belief, a business entity organized under the laws of Colombia with its principal place of business and core executive functions located at Carrera 13 #77 A-52, Bogotá, Colombia, but also actively maintains a physical office and presence within the United States at 195 Chrystie St., Of 303H, New York, New York 10002 ("Dynamo").  Dynamo is an audiovisual producer of feature films and television, and is a producer of Narcos. Dynamo has produced at least one film with production, including photography, in this venue. One of Dynamo's then-executives visited Vallejo in this venue to

2

review a pre-publication copy of Vallejo's manuscript for the Memoir in the interest of procuring potential interests and/or rights to same, and counseled Vallejo on the value of her rights in the Memoir.

6.      Netflix, Gaumont, and Narcos Productions are named in the public catalog as titleholders to a copyright pertaining to Season One of Narcos, Copyright Document Number V9913D321; Entire Copyright Document: V9913 D321 P1-5 (the "Narcos Copyright").

7.      Narcos Productions, Netflix, Gaumont, and Dynamo (collectively, "Defendants") co-produced Narcos and ultimately caused it to be distributed for viewing throughout international markets including the United States and Florida.  At the time of filing, Narcos is available for viewing through the Internet-based streaming video service or over-the-top provider, Netflix.  Netflix also distributes digital video discs ("DVDs") and Blu-ray discs of Narcos.  Defendants have also caused Narcos to be broadcast on Univision (amongst other third-party channels).

## JURISDICTION AND VENUE

8.      Defendants regularly conduct business within the State of Florida and have likewise committed the acts complained of herein in this State that have caused injury to Vallejo within the State of Florida.  This includes, but is not limited to, continuous and systematic acts relating to production of, and distribution, broadcast, dissemination and related streaming of Narcos within Florida, including through Univision with Florida-based broadcast and promotional efforts.

9.      Narcos Productions, Gaumont, and Dynamo have employed Netflix to allow the show Narcos to be streamed (which in turn has made it accessible for viewing) within the State of Florida, and caused the tortious acts complained of herein to cause harm to Vallejo (who lives and resides in this judicial district).

10.     Narcos Productions, Netflix, Gaumont, and Dynamo each has sufficient minimal

contacts to meet the minimal jurisdictional requirements under the laws of Florida and the U.S. Constitution.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1338.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, as a substantial part of the events or omissions giving rise to the claims concern copyright claims that occurred in this judicial district.   Additionally, Defendants transact business in this judicial district including through the distribution of Narcos to Florida viewers and consumers.

## GENERAL ALLEGATIONS

### Vallejo, her life, and her Memoir

### Journalist Vallejo

13.     An asylee from Colombia, now residing in Florida, internationally recognized journalist Vallejo created a stirring, widely consumed Memoir that is well known in the United States and abroad.   The Memoir is her original work and expression, based in large part on her personal experiences, many of which were unknown prior to publication of her Memoir.

14.     The Memoir is a work of approximately 400 pages, first published in the fall of 2007.  The Memoir was originally published in Spanish and later translated in 15 languages to be sold throughout Europe as well as North and South America.

15.     In order to protect the considerable value in the underlying expression found within her Memoir, Vallejo filed an application before the United States Copyright Office ("Copyright Office") for her Colombia-based version of the 396-page book "Amando a Pablo, Odiando a Escobar" listing a first date of publication of September 22, 2007.  The Copyright Office issued TX0007105765, having an effective registration date of March 11, 2010, for the underlying text

4

of the Memoir (herein after "Copyright Registration 1").

16.     In addition to securing these rights, Vallejo prepared and filed, before the Copyright Office, a second application for the Mexico-published version of the 396-page book "Amando a Pablo, Odiando a Escobar" listing a first date of publication of October 2, 2007.  The Copyright Office issued TX0007833787, having an effective registration date of January 6, 2014, for the underlying text of the Memoir (herein after "Copyright Registration 2") (herein both the Copyright Registration 1 and Copyright Registration 2 are collectively referred to as the "Copyrights-in-Suit").

17.     The Copyrights-in-Suit in the Memoir were later monetized and authorized for purposes of a motion picture production adaptation "Loving Pablo" (hereinafter the "Authorized Film").

18.     Given the considerable coverage of the Memoir, Vallejo's life experiences, and the resurgent interest in her life based on the Authorized Film, the recent re-broadcasts and Internet-based streaming of the Show and other productions pertaining to the infamous drug lord, Escobar, individuals who desire an intensely personal story about Escobar know Vallejo and the Memoir as the source of a highly unique, distinctive and expressive literary work.

**Defendants' Implicated Show - Narcos**

19.     Defendants, Netflix, Gaumont, and Dynamo are producers of Narcos, and Narcos Production is listed as an owner of the copyright for Narcos Season One, and has enforced intellectual property rights pertaining to the Show.  Narcos, Season One, in particular, devotes particular focus on the love affair between Escobar and a Colombian journalist and television personality, bearing a name which unquestionably echoes Virginia Vallejo: *Valeria Velez.*

20.     Defendants offer and widely disseminate Narcos throughout the United States,

including within the State of Florida, as an over-the-top or streaming product, as well as additionally distribute that Show in both DVD and other commonly desired digital formats.

21.     Season One of Narcos includes ten (10) episodes.

22.     Defendants initially released Season One of Narcos on August 28, 2015.  The Show has been a critical and commercial success for Defendants, although not much data is publicly available on viewership. Season One can still be streamed and/or viewed on Netflix, and has been available for streaming at all times applicable herein.

23.     The Show is currently available for download (via sale and/or rental) through various platforms, including Netflix (subscription-based), Amazon, eBay, and Best Buy, and broadcast nationally in the United States and elsewhere on Univision, including as below:

| Platform | Release's date or Price |
|---|---|
| Best Buy | $12.99 (DVD), $17.99 (Blu-ray) |
| Netflix | August 28, 2015 |
| Amazon | $12.61 (DVD) |
| Ebay | $26.00 |
| Univision Network | August 22, 2016 |

Narcos has been broadcast in numerous countries, including on or since August 28, 2015:

| Country |
|---|
| Austria |
| Belgium |
| Switzerland |
| Germany |
| France |
| Netherlands |
| United States |
| Japan |
| Spain |
| Portugal |
| Italy |

24.     Well before Defendants produced the Show, the Memoir was an international best seller.

6

25.    As such, Defendants had considerable exposure and access to the Memoir (through its widespread dissemination) which is protected by both Copyrights-in-Suit.  Defendants have had a reasonable opportunity to view the Memoir, through its wide spread dissemination and availability as an international best seller, including availability both on-line and through sale from national retail book sellers (including through Amazon.com).

26.    Defendants had an initial and direct, preliminary actual access to the Memoir, via the efforts of Dynamo.  First, prior to publication of the Memoir, an executive of Dynamo traveled to Florida to review Vallejo's manuscript of the Memoir. Dynamo's executive met Vallejo in her home, reviewed the manuscript, and counseled Vallejo on monetizing production rights pertaining to the Memoir. That Dynamo executive, Rodrigo Guerrero Rojas, admitted under oath: "I began a friendship with Vallejo and we continued to talk over the phone and meet as friends. Vallejo would share information with me, for her Book before it was published."

27.    Later, when Defendants assembled a short-list of sources upon which the writers would rely in drafting the screenplays for the Show, they explicitly listed the Memoir as a primary source.  Gaumont has acknowledged under oath the Memoir was available and ultimately accessed by the Show's writers.

28.    For these reasons, Defendants had *direct* access to the Memoir prior to the creation (*i.e.* writing of the screenplay) of the Show, and at all pertinent times thereafter.

29.    Despite such *direct* access, Defendants did not furnish any consideration or attribute any credit to Vallejo for the Show.

30.    Vallejo appeared in initial drafts and scripts/screenplays for the Show. Defendants actually used her name for the character: *Virginia Vallejo*.

31.    The screenwriters were interested in Vallejo and her story and, whether or not, in a

facetious manner referred to her as "*Natalie Wood meets Gloria Estefan*" when circulating audio of Vallejo.

32.     Notably, in subsequent scripts, Defendants morphed Vallejo's name to "Marina Martello" but then brought it back to the more similar-sounding and identifiable: "Valeria Velez."

33.     The arc of the show, including after Season One, exhibits considerable common themes, plots, storylines and arrangement as contained within the Memoir.

34.     Notably, Defendants acquired life rights from multiple other individuals whose stories were employed and/or incorporated into the Show.   However, unlike Vallejo, these individuals were compensated by Defendants for the use of their life rights.

35.     Conversely, despite using the Memoir, and having "Virginia Vallejo" as a primary character within the Show, Defendants (despite meeting Vallejo via Dynamo in circa 2007) determined to not seek Vallejo's life rights (nor any license pertaining to the Memoir).  Moreover, at the time that Defendants were obtaining these life rights, both Copyrights-in-Suit had been issued by the United States Copyright Office as notice of her valuable and exclusive rights in the Memoir.

36.     Upon comparison of Narcos with the Memoir, there are multiple expressions – all of which go beyond scènes-à-faire – including certain specific, unique and highly creative plot points and more specifically Defendants' Colombian television journalist "*Valeria Velez*" character is based upon, and duplicative of, the Memoir's original expressions through the autobiographical recounting by Vallejo herself. Moreover, these specific, unique and highly creative plot points include very detailed settings, perspectives, and events unknown to the public save for their inclusion and expression in the Memoir.

37.     In short, the underlying original expression found within Vallejo's autobiographical

Memoir unmistakably somehow found its way into *multiple* instances of expression found within Season One of Narcos.

### The Caress of a Revolver
### Episode 3, Season 1

38.     As one initial example (of several), in Narcos Season One, episode 3 ("Episode 103"), from approximately minutes 4:00 to 5:15, "*Valeria Velez*" presents a sexual encounter between the Velez character and Escobar that is substantially similar to a sexual encounter that Vallejo expresses – in detail – in the Memoir.

39.     Specifically, the original expression of the underlying event is referenced in the Memoir's chapter: *La caricia de un revolver (The caress of a revolver).*

40.     Of key importance is the couple's intimate sexual foreplay with a handgun.

41.     As a preliminary point of substantial similarity, the *Valeria Velez* character is clearly lifted directly from the Memoir's autobiographical recount by Vallejo.  First, the character is indisputably based on Vallejo.  This is so, as early drafts and writers' notes present the same character as "Virginia Vallejo."

```
INT. HACIENDA NAPOLES - FAMILY ROOM - ANTIOQUIA - DAY

A PHOTOGRAPHER clucks around Pablo, Tata, Juan Pablo, and
MANUELA as they sit for a campaign portrait.  Simultaneously,
the gorgeous VIRGINIA VALLEJO, coaches Pablo on press
questions.  Tata is fuming at the indignity of her husband's
mistress.  To make matters worse, the svelte Virginia sniffs
that Tata might want to turn a few degrees to the side because
"the camera adds at least 4 kilos."  Off Tata, humiliated.
```

42.     As noted above, it is only later that Defendants changed the name from "Virginia Vallejo" to "Marina Martello" and then, ultimately, back to a "V.V." name: "Valeria Velez."

43.     Velez, like Vallejo, is a television journalist who becomes enamored with Escobar before his violent side comes to light.

9

44.     Just like Vallejo expresses in the Memoir, the Velez character in this scene professes to *teach* Escobar.

45.     The Show's scene in Episode 103 plays out like the intimate sexual encounter Vallejo expresses in the Memoir.

- Vallejo/Velez finds herself in an elegant bedroom.

- Vallejo/Velez has been voluntarily bound by Escobar.

- Escobar has blindfolded Vallejo/Velez – a black blindfold, just as in Memoir.

- Escobar approaches Vallejo/Velez with a handgun.

- Vallejo/Velez cannot see Escobar approaching her, but he creeps toward her.



- Then Escobar is suddenly upon Vallejo/Velez.

- Escobar's hand is grasping Vallejo/Velez's hair.



- Vallejo/Velez is excited; not entirely afraid. She tries to act playful, but is nonetheless apprehensive.

- Vallejo/Velez and Escobar both engage in aggressive banter, despite Escobar's advantage.

- Escobar expresses dominance over Vallejo/Velez. The Memoir expresses Escobar as acting "[w]ith a threatening tone and an ice-cold expression in his eyes," just as in the Show.

- Escobar places the cold pistol on a partially dressed Vallejo/Velez.

- Vallejo/Velez is then (per the Memoir) "throwing [her] head back and sighing in pleasure" as "the gun starts to descend along [her] throat toward [her] heart."





- Then, Escobar uses the pistol for sexual foreplay, tracing it from Vallejo/Velez's nape down toward her abdomen.

46.   This scene in Episode 103 also folds in other expressions in the Memoir.

47.   For example, Vallejo/Velez in this scene discusses the press covering Escobar as the "Paisa Robin Hood."



While this discussion does not take place between Vallejo and Escobar during the "Caress of a Revolver" chapter of the Memoir, these elements appear elsewhere, and in conjunction with Vallejo serving as a media-relations mentor to Escobar.



In the Memoir, Vallejo writes:

The photograph of Pablo and me at the first Forum Against the Extradition Treaty becomes the first of many to document the beginning of the most well-known part of our relationship. A few months later, the magazine *Semana* will use it to illustrate an article on "the *paisa* Robin Hood," and with that generous description, Pablo will begin to build his legend, first in Colombia and then in the rest of the world. After that, in all our encounters, Pablo will greet me with a kiss and a hug followed by two spins, and then he'll always ask me:

"What are they saying in Bogotá about Reagan and me?"

And I'll tell him in detail what everyone thinks of him, because what they say about President Reagan is only interesting to Nancy's astrologist and the Republican congresspeople in Washington.

Elsewhere in the Memoir, Vallejo expresses the quid-pro-quo of her relationship with Escobar:

hundred thousand by a hundred thousand. When he finishes in a couple of minutes, I accuse him of being a kiss thief, and I ask him what I can give him in return. After thinking about it a few seconds, he says I could teach him how to give interviews, because over the course of his life he'll have to give more than a few; he praises mine and asks what my secret is. I tell him there are three: the first is to have something important, interesting, or original to say, and also something witty, because everyone

> He takes the bait, and with a smile that's something between mischievous and guilty he swears that if I teach him my professional secrets, he'll confide some of his own to me.
>
> Fast as lightning I reply that the second secret is not to answer every question the journalist asks, but instead to say what you want to say. But I insist that to play ball well you need years of practice; that is, years of fame. Someone like him should not grant interviews except to media editors or directors —since they know where curiosity ends and insult begins—or to journalists who are friends.

48.     This same quid-pro-quo features in this scene of Episode 103 and throughout the Vallejo/Velez relationship in the Show. This exchange is part of the key to the power dynamic between Vallejo and Escobar in the Memoir – wherein Vallejo/Velez maintains certain influence over Escobar – which is this same expression of power dynamic directly and inexplicitly misappropriated by the Vallejo/Velez character portrayal in the Show.

49.     The foregoing substantial similarities between the Memoir and Episode 3 of Narcos Season One are far from happenstance – especially in light of the direct access that the underlying screenwriters had with electronic versions of the Memoir (viewed via Amazon Kindle).  What is more, a closer side-by-side comparison of the expressions found within the Memoir and those contained within the Show further aggregate to confirm yet *additional* substantial similarities:

### *That* Palace in Flames & *The* Palace in Flames
### Episode 4, Season 1 of the Show

50.     Episode 4 of Season 1 of Narcos (alternatively "Episode 104") misappropriates unique expressions found in the Memoir's chapter, "That Palace in Flames," (*"Aquel palacio en llamas"*).  **Defendants went so far as copying Vallejo's Memoir chapter title for the title of this**

*pivotal and gripping episode because of the fact that it is the most stirring and revelatory chapter in Vallejo's Memoir.*

51.     Both Vallejo's book chapter and this episode recount the deadly and tragic raid on Colombia's Palace of Justice.  M-19, or the 19th of April Movement, was known in the 1980's as an armed guerilla group operating in Colombia.   The Palace of Justice housed Colombian government officials and jurists, including the Supreme Court of Colombia. On November 6, 1985, M-19 carried out an armed raid on the building, taking hostages, leading to a deadly, armed stand-off with Colombia's military.

52.     At the time of the Memoir's publication, there was no judicial or historical proof that Escobar had contributed to M-19's siege on the Palace of Justice.  Indeed, it was not until Vallejo recounted the meeting between Escobar and the head of M-19 in her Memoir, reporting that Escobar paid M-19 to commit this attack, that this suspicion found evidence.  Indeed, after publication of the Memoir, the case regarding the Palace of Justice was re-opened with a truth commission to study the tragedy, and Vallejo was called to testify about the unique and original expressions in her Memoir pertaining to this tragedy and its resulting investigation.

53.     Episode 4 of Narcos contains a scene in which Escobar personally meets with the leader of the rebel group, M-19.  In the show, this person is named *Iván Torres*.

54.     In the Memoir, Vallejo recounts the personal meeting between Escobar and M-19 leader, *Iván Marino Ospina*. While Escobar's connection to M-19 is part of the historical record, it was Vallejo's Memoir that presented a unique expression by framing the overall weight of the underlying in-person meeting, Escobar's *perceived* timing due to potential upcoming extradition proceedings to the United States, Escobar's assumption of solidarity with the guerilla group's cause, as well as vividly spotlighting how Escobar's bravado convinced M-19 to carry out the

siege by speaking in tones of Communist-style brotherhood.

55.     There is a specific discussion with Ivan and Escobar in the Memoir about the "*revolutionary fight*" of M-19.

56.     Moreover, in her Memoir Vallejo recounts Escobar's payment to M-19 for the siege of the Palace of Justice during a clandestine meeting at a hideout, detailing $2 million in payment from Escobar to M-19:

> Marino Ospina.
> "How much did you really give the M-19, Pablo?"
> "I gave a million in cash to Iván Marino, and I promised them another million in arms and financial aid down the line. Thanks to the landing strip at Nápoles, we were able to bring in some explosives, but the weapons and munitions didn't make it on time, and that was the tragedy: the plan had to be moved up because that day the court was going to start to study our extraditions, and the evidence against us was overwhelming. The M-19 only wanted to make a proclamation and demand explanations from the president, but everything went wrong. The military set fire to the palace and assassinated the magistrates so there wouldn't be any witnesses to anything that happened inside. They told Gonzalo everything, and he told me. I can admit in front of you that that million and change was the best deal of my life; but close as he is to the B-2 and as much as he hates the left, neither the Mexican nor I paid the army to assassinate six M-19 commanders! That's the

57.     Vallejo describes the M-19 "comandante" in a manner that is misappropriated by the Show. Vallejo stated in her Memoir:

17

> I imagine that the Amazonian commander will look like an army sergeant and wear camouflage, that he'll see me as an intruder in a meeting of very macho men, and that he'll do everything humanly possible to get rid of me so that Pablo will stay and talk about money. Iván Marino Ospina is a man of medium build, blunt features, wispy hair, and a mustache, and beside him Escobar looks like Adonis. I am sporting a short silk dress with high heels, and when he introduces me, Pablo is overflowing with pride. I realize immediately that this legendary guerrilla chief really isn't afraid of Pablo or of anyone else, because from the moment he lays eyes on me he doesn't take them from my face, my body, my legs; he has an inflamed gaze that to this day I don't remember ever seeing in another man.

58.    Between 34:00 and 36:00 of Episode 4 of the Series, includes a clandestine meeting at night between Escobar and M-19 at a hideout – immediately after various evidence of Escobar's drug trafficking was stored in the Palace of Justice – where Escobar offers $2 Million for M-19 to infiltrate the Palace of Justice and destroy the implicating records:



59.    Just as in the Memoir, the M-19 commander is not cowed by Escobar. They sit and speak as if equals – comrades.  In fact, in the Show the M-19 commander leans back, relaxed, bargaining with Escobar.  Conversely, Escobar leans forward, attentive, pleading.

60.    The M-19 commander fits Vallejo's physical description: He is conspicuously not

in military garb, contrary to Vallejo's expectation.  The Memoir further describes: "The M-19 leader is wearing civilian clothes." He is of medium build.  He has a beard (Vallejo describes a "mustache").

61.     Furthermore, there is a discussion of the need to bring in additional guns and men for purposes of the siege, where the M-19 representative remarks "*It's going to require more men and weapons.*"

62.     In response, Escobar in Episode 4 at 34:16 convinces M-19 to do the raid for $2 Million by discussing how both Escobar and M-19 were both fighting for *revolution* in Colombia (later at 35:19 of Episode 4 the M-19 leader remarks it is for a "*revolutionary fight*"):



Escobar ends with: "*For us . . . it is our duty to fight to the very end . . . we have an historical obligation . . .we can't ignore it.*"  Upon which the M-19 immediately confirms "*we have a deal.*"

63.     Similarly, in the Memoir, there is commiseration and revolutionary bonding among the M-19 leader, Escobar, and Vallejo. (In the Show, the Vallejo/Velez character is absent, and the revolutionary commiseration is shared only with Escobar.) Vallejo writes:

> I ask Iván Marino why he entered the revolutionary fight.
> Looking off toward that point in space where we all keep our
> painful childhood memories, he starts to tell me how, after
> Jorge Eliécer Gaitán was assassinated in 1948, in his native
> Tulúa the conservative "birds" of the Valle del Cauca murdered
> three of his uncles, one of them with machetes in front of his
> eleven children. After a pause, and with profound sadness, I
> also start to tell him how it happened that my family lost all
> their land in Cartago—very close to Tulúa—because of those
> same "birds": during the first years of La Violencia, my

Vallejo further writes:

> I express my horror at all those atrocities, my compassion
> for all the suffering, and my deep respect for the origins of the
> Colombian armed conflict. I comment on how strange it is that

Vallejo goes on to explain to the M-19 leader how she resigned as a television journalist for not

adopting the pro-government line of employer with regard to M-19:

> "Yes, in my social circle almost no one hides their
> admiration for the Chilean model, but Álvaro Gómez is no
> Laureano, *comandante*....And, though it may be hard for you
> to believe it, in 1981 I quit the highest-paid job on television for
> refusing, day after day, to refer to your group as a "band of
> criminals." In those days, I was the anchor of *24 Horas*, the
> newscast directed by Mauricio Gómez: Álvaro's son and
> Laureano's grandson."

Vallejo observes and expresses:

> Ospina seems surprised that someone like me could take such a
> costly political position, and I explain to him that since now I am
> one of those have nothing, I also have nothing to lose.
>
> He gets up and comes toward me. The guerilla leader stands up to
> say good-bye, and it seems that now he is looking at me with new
> eyes…. I wish him great success in his fight for the rights of the
> weakest….

They bond over an historical obligation to struggle against violence on the citizenry that cannot be ignored.  Here, the sympathetic bond is compacted with the M-19 commander finding solidarity with just Escobar (Vallejo/Velez is not in the scene) and making a revelatory and unexpected – if skeptical and cautious – ally in the struggle for Colombia's downtrodden.

64.     Indeed, it was the same observation and evaluation that attracts Vallejo to Escobar, and expressed in her Memoir, i.e., Escobar's seemingly genuine compassion for the poor, especially those of Medellín.

65.     Fast forward to the underlying siege of the Palace of Justice at 38:10 to 39:00 a narrative by Agent Murphy remarks that the army assassinated M-19 commanders, as well as the magistrate of the Palace of Justice.  The scene during this monologue shows what appears to be five M-19 commanders during this time – burning the incriminating Escobar files – immediately prior to their demise.  There is an overall suggestion made that M-19 is under equipped and outmanned for the fight at hand – hinting the additional reinforcements never came.

66.     By comparing these scenes of Episode 4 to the Memoir – it is inescapable that Episode 4 is derived directly from the underlying expression found within the Memoir.

67.     As shown by the foregoing, Defendants have misappropriated multiple separate and independent original portions of Vallejo's unique protectable expressions (none of which constitute scenes-a-faire) found within the two (2) Copyrights-in-Suit.

68.     As shown by the foregoing examples, Defendants' taking of this separate, unique, and artistic expression of the events and imagery found within the two Copyrights-in-Suit was done without the knowledge, permission, authority, license, or right of Vallejo.

69.     What is more, Defendants not only misappropriate portions of Vallejo's highly unique protected expressions, but they do so by creating a would-be stand-in character – where

*Defendants chose the name with initials V.V.* so as to intentionally and unquestionably link Velez as Vallejo.

70.     Indeed, the actor portraying Velez, Stephanie Sigman, is quoted[2] as admitting the obvious, stating:

| "Hago a Valeria Velez, un personaje distinto basado en la amante de Pablo Escobar, Virginia Vallejo, un personaje importante en Colombia". | "I play Valeria Velez, a different character based on Pablo Escobar's lover, Virginia Vallejo, an important person in Colombia." |
|---|---|

71.     Further, the actor portraying Pablo Escobar, Wagner Moura ("Moura"), in an interview[3], is quoted admitting that he drew inspiration for his character from books about Pablo Escobar written in Spanish and he goes on to acknowledge that Vallejo, upon whom the Velez character is based, "wrote a great book – one of the best books – called *Loving Pablo, Hating Escobar*."

72.     Without question, Defendants intended not only to misappropriate the most valuable and gripping portions of Vallejo's Memoir as the gravamen of Narcos, but went even further by adopting a character whose name and characteristics all clearly associate with Vallejo's notoriety, goodwill and publicity rights – all in a deliberate and unbridled effort to increase the economic value of the Show.

---

[2] Gabriela Acosta, Entrevista exclusiva con la nueva chica Bond mexicana, *available at*: https://www.publimetro.com.mx/mx/noticias/2015/03/11/entrevista-exclusiva-con-la-nueva-chica-bond-mexicana.html (last visited August 22, 2018).
[3] Lisa Liebman, Narcos's Wagner Moura on Playing Pablo Escobar and Why He Learned Spanish Before He Got the Part, *available at*: https://www.vulture.com/2015/09/narcos-wagner-moura-on-playing-pablo-escobar.html (last visited June 6, 2019)

73.     As such, Defendants misappropriated the goodwill associated with Vallejo's work for unauthorized commercial purposes and represented the Show in a manner that suggests it was approved, endorsed, sponsored, licensed and/or affiliated with Vallejo.

74.     Upon information and belief, Defendants acted knowingly and willfully in the way and manner that it declined to seek right or license from Vallejo for permission to adapt portions of the Memoir, but used expressions of events and statements in the Memoir for Narcos, nonetheless.  This information and belief is based in part on the commercial success and notoriety of the Memoir for a period of years before the development of Narcos.

75.     Moreover, the mimicry of Vallejo's chapter name (That Palace in Flames) coupled with the other misappropriations of unique expressions (The Caress of a Revolver) further confirm this intentional and knowing misconduct – all designed to suggest an affiliation and/or endorsement by Vallejo of these portions of Season One of the Show.  The end result of Defendants' collective misconduct is the unauthorized exploitation of both of Vallejo's copyright registrations. Defendants' ensuing promotion of both the Show, and ultimate commercial success, has resulted in considerable pecuniary gain to Defendants.

76.     All of the foregoing has caused irreparable harm to Vallejo.

### COUNT I
### COPYRIGHT INFRINGEMENT
**(United States Copyright Registration TX0007105765)**

77.     This Count I is an action for damages based on copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

78.     Vallejo repeats and re-alleges the allegations of paragraphs 1-76 of this Complaint as though fully set forth herein.

79.     Vallejo is the owner of a copyright for the original work of authorship for the

Memoir.

80.     The United States Register of Copyrights issued Copyright Registration No. TX0007105765 regarding the Memoir (the "Copyright Registration 1").

81.     Copyright Registration 1 is both valid and subsisting.

82.     Vallejo is the owner of the entire right, title and interest in and to Copyright Registration 1, which protects the Memoir.

83.     Defendants directly and indirectly infringed Copyright Registration 1 by violating the exclusive rights of Vallejo, through Defendants' copying, reproduction, distribution and adaptation of this text, namely through the preparation, distribution, dissemination, broadcasting, streaming and any and all related acts of display of the Show.

84.     Defendants also controlled and financially benefitted from the Show.

85.     Upon information and belief, Defendants' infringing activities were knowingly engaged in with a willful and reckless disregard of Vallejo's rights.

86.     Defendants' reproduction, preparation of derivative copies, advertising, distribution, and broadcast of the Show was, and continues to be, without license, and therefore constitutes an infringement in violation of 17 U.S.C. § 501.

87.     Vallejo has suffered a compensable injury due to the infringing activities of Defendants.

88.     Vallejo is entitled to recover either statutory and/or actual damages incurred as a result of Defendants' infringing activities.

**COUNT II**
**COPYRIGHT INFRINGEMENT**
**(United States Copyright Registration TX0007833787)**

89.     This Count II is an action for damages based on copyright infringement in violation

of 17 U.S.C. § 501, *et seq.*

90.     Vallejo repeats and re-alleges the allegations of paragraphs 1-76 of this Complaint as though fully set forth herein.

91.     Vallejo is the owner of a copyright for the original work of authorship represented by the Memoir.

92.     The United States Register of Copyrights issued Copyright Registration TX0007833787 regarding the Memoir (the "Copyright Registration 2").

93.     Copyright Registration 2 is both valid and subsisting.

94.     Vallejo is the owner of the entire right, title and interest in and to Copyright Registration 2, which protects the Memoir.

95.     Defendants directly and indirectly infringed Copyright Registration 2 by violating the exclusive rights of Vallejo, through Defendants' copying, reproduction, distribution, and adaptation of this text, namely through the preparation, distribution, dissemination, broadcasting, streaming and any and all related acts of display of the Show.

96.     Defendants also controlled and financially benefitted from the Show.

97.     Upon information and belief, Defendants' infringing activities were knowingly engaged in with a willful and reckless disregard of Vallejo's rights.

98.     Defendants' reproduction, preparation of derivative copies, advertising, distribution, and display of the Show was, and continues to be, without license, and therefore constitutes an infringement in violation of 17 U.S.C. § 501.

99.     Vallejo has suffered a compensable injury due to the infringing activities of Defendants.

100.    Vallejo is entitled to recover either statutory and/or actual damages incurred as a

result of Defendants' infringing activities.

## PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, Plaintiff VIRGINIA VALLEJO requests

this Honorable Court grant relief in the following manner:

a.   Vallejo be awarded all monetary remedies available under the Copyright Act, including but not limited to, compensatory damages, statutory damages, treble damages, interest, costs and attorney's fees as legally permitted;

b.   Enter a judgment against Defendants in an amount suitable to recompense Vallejo for her loss of copyright licensing revenues; and

c.   Any and all other relief that this Honorable Court deems just.

## JURY TRIAL REQUEST

Plaintiff VIRGINIA VALLEJO requests a trial by jury.

Respectfully submitted on June 6, 2019.

*/s/ Robert H. Thornburg*
Robert Thornburg
Florida Bar No. 630829
E-Mail: rthornburg@allendyer.com
Stephanie Vazquez
Florida Bar No. 1011124
E-Mail: svazquez@allendyer.com
ALLEN, DYER, DOPPELT
+GILCHRIST, P.A.
1221 Brickell Ave., Suite 2400
Miami, Florida 33131
Telephone:    (305) 374-8303
Facsimile:    (305) 374-8306

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 6, 2019, I presented the foregoing to the Clerk of the Court for uploading to the Case Management/Electronic Case Files ("CM/ECF") System, which will send a Notice of Electronic Filing to Counsel of Record:

Scott D. Ponce
Florida Bar No. 0169528
E-Mail: scott.ponce@hklaw.com
Rebecca J. Cañamero
Florida Bar No. 86424
E-Mail: rebecca.canamero@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone:     (305) 374-8500
Facsimile:     (305) 789-7799

Louis P. Petrich *(Admitted pro hac vice)*
E-Mail: lpetrich@lpsla.com
LEOPOLD, PETRICH & SMITH
2049 Century Park East – Suite 3110
Los Angeles, California 90067
Telephone:     (310) 277-3333

*Counsel for Defendants*

*s/Robert H. Thornburg*
Robert H. Thornburg