UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-23462-CIV-SMITH/FLEISCHER-LOUIS

VIRGINIA VALLEJO,
an Individual,

      Plaintiff,
v.

NARCOS PRODUCTIONS LLC,
a Delaware limited liability company;
NETFLIX, INC., a Delaware corporation; and
GAUMONT TELEVISION USA LLC f/k/a
GAUMONT INTERNATIONAL TELEVISION LLC,
a Delaware limited liability company;

      Defendants.
_____/

**Plaintiff Virginia Vallejo's Response in Opposition to Defendants
Narcos Productions, LLC, Netflix, Inc. and Gaumont Television USA, LLC's
Motion to Dismiss for Lack of Subject Matter Jurisdiction [D.E. 100]**

Plaintiff, Virginia Vallejo ("Plaintiff" or "Vallejo"), hereby responds in opposition to Defendant Narcos Productions, LLC ("NPL"), Netflix, Inc. ("Netflix") and Gaumont Television USA, LLC's ("Gaumont") (collectively, "Defendants") Motion to Dismiss for Lack of Subject Matter Jurisdiction ("MTD") [D.E. 100] and provides as follows:

**I.   INTRODUCTION AND OVERVIEW**

Defendants, in a last-ditch effort to delay a trial on the merits of this copyright infringement suit, filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction [D.E. 100] based on arguments which rely upon misinterpretations of the provisions of the motion picture rights option agreement tiled "*Amando a Pablo, Odiando a Escobar'\ aka Loving Pablo, Hating Escobar/ Option/Purchase Agreement*" (herein the "Motion Picture Agreement") originally entered into with One Lane Highway, Inc. (later known as Dean Nichols Productions, Inc.) (herein "Dean

Nichols Productions") and Pinguin Films, Inc. (herein "Pinguin Films") (collectively, the "Movie Producers") for the production of the film "Loving Pablo" (herein, the "Loving Pablo Film"). In their MTD, Defendants improperly move to dismiss this action based on Vallejo's purported lack of standing to prosecute claims of copyright infringement.

As a starting point, Defendants, referring to the Motion Picture Agreement, misrepresent to the Court that Vallejo failed to "even disclose its existence." D.E. 100, pg. 1. This is wholly misleading as Vallejo previously produced to Defendants, during the discovery period, the underlying short form assignment referencing the existence of the Motion Picture Agreement. Tellingly, Defendants fail to alert the Court how they never followed up with Vallejo regarding objections lodged in her discovery responses, never sought the underlying Motion Picture Agreement, nor made any effort to confer regarding its production. The docket tells that story – namely how Defendants never sought to compel any discovery from Vallejo. It is because Defendants never had to – Vallejo produced all appropriate discovery asked by Defendants. There was no effort by Vallejo to withhold relevant documents – as corroborated in the record.

Defendants' counsel, at the eleventh hour, on August 30th, twelve weeks after the close of the discovery period, during a telephonic conference organized by Vallejo to finalize pretrial matters, asked Vallejo's counsel for a copy of the Motion Picture Agreement.[1] Nonetheless, Vallejo courteously and in good-faith provided Defendants a post-discovery copy of the Motion Picture Agreement that same day, on August 30th, the first time Defendants attempted to confer with Vallejo regarding the production of that agreement. Despite the fact that the discovery period had ended, and that Defendants never sought to meet and confer or compel the document during

---

[1] Notably, Defendants' counsel's last-minute attempt to receive a copy of the agreement shows that Defendants were well aware of its existence.

the discovery period, Vallejo chose to produce the Motion Picture Agreement to dispel any doubts regarding its content.  Why?  Because Vallejo never attempted to withhold that document as it clearly confirms Vallejo's 17 U.S.C. § 106 rights to bring and maintain this infringement suit.

Nearly three months prior to Defendants' post-discovery period request on August 30th, Vallejo served objections, on June 3, 2019, to Defendant NPL's request for production requesting documents "sufficient to show the terms on which [Vallejo] authorized a motion picture adaptation of [the] Memoir" based on Defendants' access to said documents as Defendant Netflix was a distributor of the Loving Pablo Film and based on confidentiality provisions in the agreement. Surprisingly, Defendants never challenged Vallejo's objections during the discovery period.

Moreover, once Defendants' counsel received the Motion Picture Agreement, Defendants' counsel failed to address any questions regarding the agreement with Vallejo.  Instead, Defendants rushed to file the MTD without conducting due diligence regarding the date of exercise of the option or the underpinnings of that agreement.  As such, Defendants' MTD failed to present any evidence as to the date of exercise of the option embodied in the Motion Picture Agreement, which they allege conveyed all of Vallejo's rights in the Memoir to the Movie Producers and merely speculate that an option was exercised without bothering to specify when.

What is more, the MTD further fails to address information that Defendants squarely have in their possession – how the majority of viewership and interest of both implicated Episodes 103 and 104 of *Narcos* Season One (and thus the grand majority of profits realized) from public display of both implicated infringing audiovisual works occurred prior to the option exercise of the Motion Picture Agreement.  While Defendants fail to mention that key fact to the Court – which underlying factual support is well within their own wheelhouse – Vallejo's damages expert Alexander

Clemons confirms via the attached declaration ("Clemons Decl.") his analysis / opinions regarding the timing of that viewership and how the majority of damages occurred prior to exercise.

## II. FACTUAL BACKGROUND

On January 4, 2013, Vallejo, along with Vallejo's affiliated company, Vidalinda Enterprises LLC, One Lane Highway, Inc. (later known as Dean Nichols Productions, Inc.) and Pinguin Films[2] memorialized the Motion Picture Agreement which granted Dean Nichols Productions and Pinguin Films *an option* to purchase certain limited exclusive rights to produce a motion picture utilizing the copyrights in the memoir titled "Amando a Pablo, Odiando a Escobar" (in English, "Loving Pablo, Hating Escobar") (herein, the "Memoir") authored and owned by Vallejo. See Declaration of Virginia Vallejo ("Vallejo Decl."), ¶ 2. That limited rights agreement provided the Movie Producers an initial option period of eighteen months to purchase only motion picture rights in Vallejo's Memoir. Vallejo Decl., Ex. A, pg. 1, ¶2. Additionally, the Motion Picture Agreement provided for an eighteen month extension of the option period subject to a $1.00 payment to Vallejo. *Id*. The Motion Picture Agreement also specified that the Movie Producers "may exercise the option at any time during the Option Period by providing the Owner with written notice thereof and by paying Owner . . . the Purchase Price set forth in Paragraph 3(a) below." Vallejo Decl. Ex. A, pg. 2, ¶3. Alternatively, if the Movie Producers commence principal photography before exercising the option, the Motion Picture Agreement provided in Paragraph

---

[2] One Lane Highway is a California corporation, formerly known as Conforza, Inc. incorporated in 2010 and wholly owned by film producer Dean Nichols. Pinguin Films is a California corporation wholly owned by actor and film producer Javier Bardem, whom ultimately played the role of Pablo Escobar in the resulting film titled "Loving Pablo" (herein the "Loving Pablo Film"). Both One Lane Highway and Pinguin Films engage in the business of development, acquisition, production, and exploitation of feature motion pictures.

3(c) that the option shall be "deemed to have been exercised and the Purchase Price shall be payable on commencement of principal photography of the Picture." *Id.*

In late June 2014, the Movie Producers provided Vallejo a $1.00 check and notice via a written letter informing how they wished to extend the option period for the additional eighteen month period pursuant to Section 2(a) of the Motion Picture Agreement, effectively extending the option period until January 4, 2016. Vallejo Decl. ¶10.  Later, the Movie Producers provided Vallejo a $50,000.00 check and written notice, dated December 19, 2015, that they were exercising the option as defined in Section 3 of the Motion Picture Agreement and that such check was payment for the agreed-on Purchase Price referenced in Paragraphs 3 a) & 3 b) of the Motion Picture Agreement. Vallejo Decl., ¶11.  While such payment was received by Vallejo in late December 2015, Dean Nichols confirmed to Vallejo four months later in April 2016 that principle photography of the Loving Pablo Film would commence in mid-October 2016. Vallejo Decl. ¶12.

Given that the option was not executed until December 19, 2015, Vallejo did not assign any rights (which at most were limited to movie rights only) in her book on January 4, 2013, as Defendants represent to the Court in their MTD.  On January 4, 2013, Vallejo merely entered into *an option* agreement with motion picture producers One Lane Highway and Pinguin Films. Vallejo remained the exclusive and lawful owner of *all* 17 U.S.C. § 106 rights in her Memoir - including all rights under copyright to make copies and derivative works such as motion pictures until at least December 19, 2015 - *over 16 weeks after the release of Narcos Season One* on August 28, 2015.

Nonetheless, both the option and subsequent exercise, as embodied in the Motion Picture Agreement was limited to exclusive rights only to produce a motion picture based on Vallejo's Memoir and excluded any transfer of television production rights (or related rights).

What is more, there is a sixteen-week gap between the launch of *Narcos* Season One – which occurred on August 28, 2015 – and the December 19, 2015 exercise. In launching *Narcos* Season One, Defendant Netflix simultaneously made available for access and streaming all episodes (including implicated Episodes 103 and 104) on its platform. According to the analysis of Vallejo's expert, Alexander Clemons, "it is clear that the substantial majority of damages owed by Defendants to plaintiff [ ] had already accrued by" the December 19, 2015 exercise under the Motion Picture Agreement. Clemons Decl. ¶8. Put another way, "the majority of the damages calculated in [his original June 7, 2019 served expert report supplied as part of Vallejo's motion for summary judgment] accrued prior to" December 18, 2015. *Id.* at ¶6.

Therefore, Defendants' arguments that Vallejo lacks standing to sue for copyright infringement of her Memoir based on the production and release of the *Narcos* television series invariably fails and the MTD should be dismissed.

### III. VALLEJO OWNED ALL RIGHTS TO HER MEMOIR UNTIL THE EXERCISE OF THE OPTION BY DEAN NICHOLS PRODUCTIONS, INC. AND PINGUIN FILMS ON DECEMBER 19, 2015

Vallejo retained all rights in her Memoir including all rights to make copies and derivative works such as motion pictures at least until the option to purchase the motion picture rights to her Memoir was exercised by Dean Nichols Productions, Inc. (previously known as One Lane Highway, Inc.) and Pinguin Films pursuant to the Motion Picture Agreement. The Motion Picture Agreement provides that the Movie Producers could "exercise the option at any time during the Option Period by providing the Owner with written notice thereof and by paying Owner. . . the Purchase Price set forth in Paragraph 3(a) below." The option was not exercised until December 19, 2015, when Dean Nichols provided Vallejo a letter notifying her in writing that the Movie Producers were exercising their option to purchase Vallejo's rights pursuant to the Motion Picture

Agreement and provided her a check for $50,000.00 USD completing payment of the Purchase Price defined in Paragraph 3(a).

To interpret the Motion Picture Agreement and the effect of the option embodied in the contract, the Court must look to the laws of the State of California as provided in Paragraph 24 of the Motion Picture Agreement. Vallejo Decl. Ex. A, pg. 11, ¶24 ("This Agreement shall be governed and construed in accordance to the laws of the State of California applicable to contracts entered into and fully performed therein."); *See also Integral Dev. Corp. v. Tolat*, No. 12-cv-06575-JSW (JSC), 2016 U.S. Dist. LEXIS 187832, at *8 (N.D. Cal. Dec. 23, 2016).

Under California Law, an option is "a unilateral contract under which the optionee, for consideration he has given, receives from the optioner the right and the power to create a contract of purchase during the life of the option." *Erich v. Granoff*, 109 Cal. App. 3d 920, 927, 167 Cal. Rptr. 538 (1980); see also *Buena Vista Biomass Dev., LLC v. Oneto Grp., Inc.*, No. 2:08-CV-1011 JAM DAD, 2008 U.S. Dist. LEXIS 111544, 2008 WL 2693181, at *3 (E.D. Cal. July 2, 2008) ("An option is a contract, made for consideration, to keep open for a prescribed period, which is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract.") (citing *Erich*, 109 Cal. App. 3d at 927-28). "An option may be viewed as a continuing, irrevocable offer to sell property to an optionee within the time constraints of the option contract and at the price set forth therein." *Erich*, 109 Cal. App. 3d at 927. The irrevocable offer does not become binding on the optioner until the optionee exercises it as the option contract prescribes. *Palo Alto Town & Country Vill., Inc. v. BBTC Co.*, 11 Cal.3d 494, 502-03, 113 Cal. Rptr. 705, 521 P.2d 1097 (1974) ("[W]hen the provisions of an option contract

prescribe the particular manner in which the option is to be exercised, they must be strictly followed.").

Therefore, by entering into an option agreement, Vallejo only granted Dean Nichols Production, Inc. and Pinguin Films the right and the power to create a contract of purchase during the life of the option. It was not until the option was exercised, that any of Vallejo's rights to her Memoir were assigned or transferred to Dean Nichols Production, Inc. and Pinguin Films. As a result, Vallejo was the lawful owner of *all rights* in her Memoir on August 28, 2015, the release date of *Narcos* Season One on Netflix, the date when her claims for copyright infringement against Defendants accrued. As all claims against Defendants accrued prior to the sale of any of Vallejo's rights to One Lane Highway and Pinguin Films she alone is fully entitled to sue Defendants for copyright infringement as the sole owner of all rights at that time.

Moreover, it is well settled that the mere assignment of a copyright does not confer standing on the assignee to sue for past infringement, unless the assignor expressly assigns an accrued cause of action for infringement along with the copyright. See *Prather v. Neva Paperbacks, Inc.*,[3] 410 F.2d 698, 699 (5th Cir. 1969) ; see also *Wiley & Sons v. DRK Photo*, 882 F.3d 394, 403-04 (2d Cir. 2018); *Silvers v. Sony Pictures Entm't*, 402 F.3d 881, 890 n. 1 (9th Cir. 2005).

Under the Copyright Act, only the "legal or beneficial owner of an exclusive right under a copyright" may "institute an action for any infringement of that particular right while he or she is the owner of it." *Optima Tobacco Corp. v. US Flue-Cured Tobacco Growers, Inc.*, 171 F. Supp. 3d 1303, 1308 (S.D. Fla. 2016)(citing 17 U.S.C. § 501(b); *see also Prof'l LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1369 (S.D. Fla. 2015)). "The copyright owner must have

---

[3] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

such status at the time of the alleged infringement to have standing to sue." *Id*. (citing *World Thrust Films Inc. v. Int'l Family Entm't Inc.*, No. 93-0681—CIV, 1996 U.S. Dist. LEXIS 16631, 1996 WL 605957, at *4 (S.D. Fla. Aug. 1, 1996); *see also Lorentz v. Sunshine Health Prods., Inc.*, No. 09-61529—CIV, 2010 U.S. Dist. LEXIS 101019, 2010 WL 3733986, at *8 (S.D. Fla. Aug. 27, 2010)).

Thus, because Vallejo was the lawful owner of all rights in her Memoir including all rights to make copies and derivative works such as motion pictures, at the time of Defendants infringement of Vallejo's copyrights in her Memoir, Vallejo thus has the right to sue Defendants for the copyright infringement claims that accrued prior to the exercise of the option, irrespective of Defendants' misinterpretation of the rights granted by Vallejo to Dean Nichols Production, Inc. and Pinguin Films following the exercise of the option embodied in the Motion Picture Agreement.

### IV. VALLEJO ONLY ASSIGNED SPECIFIC RIGHTS TO THE PRODUCTION OF A MOTION PICTURE BASED ON HER MEMOIR

While the Court's analysis of Defendants' MTD should end upon the determination that Vallejo's copyright claims against Defendants accrued prior to the sale of any of Vallejo's rights to Dean Nichols Production and Pinguin Films and she alone is entitled to sue Defendants for copyright infringement, Vallejo nonetheless provides the following analysis of the Motion Picture Agreement to address Defendants misinterpretation of the contract provisions.

Defendants misrepresent to the Court that Vallejo kept "for herself only the right to distribute printed and e-book versions of the Memoir and to write sequels to her book." D.E. 100, pg. 2. That is not the case: the Motion Picture Agreement conveys to the Movie Producers solely the exclusive motion picture rights in the Memoir *only* and expressly holds back television production rights as contemplated between the parties to the Motion Picture Agreement. *See* Vallejo Decl., Ex. A, ¶ 6, 8(a).

As explained in Section III above, the Motion Picture Agreement is governed by the laws of the State of California. Under California law, the parties' intent determines the contract's meaning. Cal. Civ. Code § 1636. Thus, when construing a written contract, "the intention of the parties is to be ascertained from the writing alone, if possible." *Integral*, No. 12-cv-06575-JSW (JSC), 2016 U.S. Dist. LEXIS 187832, at *8. (citing Cal. Civ. Code §§ 1639-40; *Wolf v. Walt Disney Pictures & Tel.*, 162 Cal. App. 4th 1107, 1125, 76 Cal. Rptr. 3d 585 (2008)); *See also Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125, 197 Cal. Rptr. 3d 219, 225 (2015) ("We interpret a contract "to give effect to the mutual intention of the parties as it existed at the time of contracting."). "The whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Moreover, a contract's words are to be understood in their ordinary and popular sense. Cal. Civ. Code § 1644.

Upon a plain reading, the language of the Motion Picture Agreement itself limits the resulting grant of rights in Vallejo's Memoir solely to motion picture and allied rights. In particular, the "Grant of Rights" provision and the Frozen Rights Paragraph 8(a) provision of the Motion Picture Agreement provides as follows (emphasis added):

> (a) **If the Option is exercised**, Purchaser automatically and irrevocably shall own and be vested with, and Owner automatically and irrevocably shall be deemed to have granted, conveyed, assigned, transferred and set over to Purchaser, exclusively and in perpetuity, for the entire universe, in any and all languages, all right, title and interest in, to and with respect to the Property and **all rights** (now or hereafter known or devised) under any and all copyrights therein and thereto **except for the rights reserved under Paragraph 7 below and subject to the holdback of television production rights pursuant to Paragraph 8(a) below (collectively, the "Rights").** Without limiting the generality of the foregoing, **the Rights shall in any and all events include**, without limitation, all of the following:
>
> > (i) the **sole and exclusive motion picture rights**, including, without limitation, **the sole and exclusive right to produce one (1) or more**

> **motion pictures or other derivative works (including, without limitation, sequels, prequels, remakes, musicals and/or serials)** based, in whole or in part, on the Property and the right to fix, release, distribute, exhibit, perform, transmit, broadcast, advertise, promote and otherwise exploit such **motion pictures or other derivative works** by any and all means and in any and all media whether now known or hereafter devised, including, without limitation, all of the following**:**
>
>> theatrical;
>>
>> non-theatrical (including airlines, ships and other carriers, military, educational, industrial and the like);
>>
>> pay-per-view;
>>
>> home video (including videocassettes, digital videodiscs, laserdiscs, CD-ROMs and all other formats);
>>
>> all forms of television (including pay, free, network, syndication, cable, satellite, high definition and digital);
>>
>> video-on-demand and near video-on-demand;
>>
>> and all forms of digital distribution and/or transmission (including, without limitation, the internet), CD-ROMs, fiber optic or other exhibition, broadcast and/or delivery systems; all rights of communication to the public, rights of distribution to the public or other forms of public or private communication and/or distribution; and all forms of dissemination, communication or distribution to one or more identifiable locations or parties;

. . .

8. FROZEN RIGHTS:

(a) **Television Production Rights**: Notwithstanding anything to the contrary contained herein, during the period commencing on the date hereof and ending on the date which is five (5) years from the exercise of the Option, **Purchaser shall not have the right to produce, exploit or distribute an audiovisual production based on the Property in a manner intended for initial television broadcast without Owner's prior written consent.** By way of clarification, the parties acknowledge and agree that the foregoing shall not restrict in any manner the production, exploitation and distribution of any audiovisual production based on the Property in a manner intended for initial exploitation by means other than television broadcast.

Vallejo Decl., Ex. A, ¶ 6, 8(a). In the Grant of Rights paragraph, the agreement first provides that the rights conveyed do not include "the rights reserved under Paragraph 7 below and subject to the holdback of television production rights pursuant to Paragraph 8(a) below (collectively, the "Rights")." Nonetheless, to provide further clarity, the agreement goes on to further define the term "Rights" as including "(i) the sole and exclusive motion picture rights." The remainder of the (i) subsection addresses "the sole and exclusive motion picture rights" conveyed by providing that these motion picture rights include "the sole and exclusive right to produce one (1) or more motion pictures or other derivative works (including, without limitation, sequels, prequels, remakes, musicals and/or serials)." In other words, the agreement allows the Movie Producers to produce a motion picture or other derivative motion picture work such as a sequel film, prequel film, remake film, musical-genre film or series of films. Such is the only "ordinary and popular sense" reading of those provisions. Then, the (i) subsection goes on to list all types of media by which Movie Producers can fix, release, distribute, exhibit, perform, transmit, broadcast, advertise, promote and otherwise exploit such motion pictures or other derivative motion picture works including theatrical, non-theatrical, pay-per-view, home video, etc.

      Nevertheless, Defendants misinterpret the Grant of Rights paragraph as somehow granting Movie Producers television production rights in Vallejo's Memoir despite the express limitation stating that the Rights are "subject to the holdback of television production rights pursuant to Paragraph 8(a)" and the fact that that television production rights are not mentioned within the enumeration of the "Rights" conveyed.

      Additionally, Defendants argue that the holdback of television production rights pursuant to Paragraph 8(a) is of no consequence because the *Narcos* television series or "TV Show", as Defendant Netflix categories it on its platform, was not "intended for initial television broadcast."

However, as California law provides, a contract should be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." *Lewis*, 244 Cal. App. 4th at 125. At the time of the drafting and execution of the Motion Picture Agreement, on January 4, 2013, the concept of straight-to-internet streaming television series was not well known or accepted. In fact, Defendant Netflix itself did not launch its first Netflix Original Series[4] until February 1, 2013 when it released "House of Cards."[5] Similarly, the competing internet-streaming service by Amazon did not release its first original television series until January 9, 2013,[6] when it released "Annedroids." In light of the novelty of straight-to-internet streaming television series, the parties to the Motion Picture Agreement defined television production rights under the traditional definition of an "audiovisual production based on the Property in a manner intended for initial television broadcast."  Such does not change the intention of the parties to negotiate solely for the motion picture production rights in the Memoir. As such, the Court should interpret television production rights and Paragraph 8(a) as holding back television production rights including straight-to-internet streaming television series, such as *Narcos.*  To hold the contrary would disregard the intention of the parties to the Motion Picture Agreement.

Further, should the Court determine that the Motion Picture Agreement is reasonably susceptible to more than one interpretation - in other words, if an ambiguity exists, under California law, a court may consider extrinsic evidence offered to prove the parties' mutual intent. *See Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 114, 55 Cal. Rptr. 3d 621 (2007); see also *Shum v. Intel Corp.*, No. C-02-03262-DLJ, 2008 U.S. Dist. LEXIS 83005, 2008 WL 4414722, at *6 (N.D. Cal. Sept. 26, 2008).

---

[4] *See* https://en.wikipedia.org/wiki/List_of_original_programs_distributed_by_Netflix (last viewed Sept. 2019).
[5] *See* https://en.wikipedia.org/wiki/House_of_Cards_(American_TV_series) (last viewed Sept. 19, 2019).
[6] *See* https://en.wikipedia.org/wiki/List_of_original_programs_distributed_by_Amazon (last viewed Sept. 19, 2019).

Courts may engage in a two-step process of interpretation to resolve any potential ambiguities: 1) the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning, and 2) if in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step - interpreting the contract. *See SCC Alameda Point LLC v. City of Alameda*, 897 F. Supp. 2d 886, 893 (N.D. Cal. 2012); *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1223 (9th Cir. 2008); *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004). Notably, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011); (citing *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912, 75 Cal. Rptr. 2d 573 (1998)).

Moreover, under California law, admissible extrinsic evidence includes: (1) the circumstances under which the contract was made and the matter to which it relates; (2) the parties' statements during negotiations and communicated intent; (3) the parties' "course of dealing" and "course of performance," including pre-dispute conduct; and (4) usage of trade. *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*, 870 F. Supp. 2d 881, 917 (C.D. Cal. 2012).

Throughout Vallejo's negotiations with the Movie Producers leading up to the execution of the Motion Picture Agreement, she clearly expressed to the Movie Producers that she intended to negotiate the television rights for television productions based on her Memoir separately from her motion picture rights. Vallejo Decl., ¶ 5.  One example of Vallejo's expressed intentions to negotiate television production rights separately is embodied in a November 27, 2012 email to Dean Nichols, where Vallejo expresses "why [she] want[ed] to negotiate [ ] television rights

separately. . . ." *Id.* Moreover, the Movie Producers well understood Vallejo's intentions to negotiate television production rights separately. *See* Vallejo Decl., ¶ 6. To illustrate his understanding, Dean Nichols, on December 4, 2012, wrote an email to Vallejo confirming that he understood she "would only grant limited rights; which would include motion picture only." *Id.* He also acknowledged that he understood that Vallejo "would 'hold back' allied and television rights to be sold to simultaneously to another 3rd party, which could include another television and motion picture company. . . " and asked to set up a phone call to discuss and "come to an agreement together." *Id.* The following day Dean Nichols wrote a follow-up email thanking Vallejo for the "wonderful conversation" and expressing how "thrilled" One Lane Highway and Pinguin Films were to bring Vallejo's "important and powerful memoir, 'Amando a Pablo, Odiando a Escobar', By Virginia Vallejo to the screen as a motion picture." Vallejo Decl., ¶ 7. In the same email he also provided a list of "deal terms" which stated under the title TV RIGHTS, the following: "Virginia, as we discussed, I need to consult with the attorneys' to figure out a way that both you and I and the film/Character is protected and not being exploited with TV rights. I am fairly certain that we could put something in that protects everyone from making a TV show. I need more details on what the film companies will require and write something that protects us both, including the film company/production."

As the documentary evidence clearly provides, the parties to the Motion Picture Agreement were well aware that Vallejo did not intend to convey television production rights and as a result the parties drafted Paragraph 8(a) as a provision intended to holdback television production rights.

**V.   CONCLUSION**

Based upon the foregoing, Vallejo respectfully requests that this Court deny Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [D.E. 100].

Respectfully submitted this September 19, 2019.

*s/ Robert H. Thornburg*
Robert H. Thornburg
Florida Bar No. 630829
E-Mail: rthornburg@allendyer.com
Stephanie Vazquez
Florida Bar No. 1011124
E-Mail: svazquez@allendyer.com
ALLEN, DYER, DOPPELT
+ GILCHRIST, P.A.
1221 Brickell Avenue, Suite 2400
Miami, Florida 33131
Telephone: (305) 374-8303
Facsimile: (305) 374-8306

*Counsel for Plaintiff Virginia Vallejo*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 19, 2019, I presented the foregoing to the Clerk of the Court for uploading to the Case Management/Electronic Case Files ("CM/ECF") System, which will send a Notice of Electronic Filing to Counsel of Record:

Scott D. Ponce
Florida Bar No. 0169528
E-Mail: scott.ponce@hklaw.com
Rebecca J. Cañamero
Florida Bar No. 86424
E-Mail: rebecca.canamero@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone:     (305) 374-8500
Facsimile:     (305) 789-7799

And

Louis P. Petrich *(Admitted pro hac vice)*
BALLARD SPAHR LLP
2029 Century Park East – Suite 800
Los Angeles, California 90067
Telephone:     (424) 204-4350

*Counsel for Defendants*

                                           *s/ Robert H. Thornburg*
                                           Robert H. Thornburg